## Fegelson Estate

*Harry J. Liederbach* and *Reuben Singer*, for accountant.

*Edward J. McGlinchey* and *Myer L. Carson*, for claimant.

SATTERTHWAITE, P. J., April 29, 1966.—The first and final account of Selma F. Fegelson, executrix of the estate of said decedent, was presented to the court for audit, confirmation and distribution of ascertained balances on December 6, 1965, as advertised according to law. Due proof appears in the record of appropriate notice thereof to all parties legally interested in said estate, except to the County of Bucks, Personal Property Tax Department, the creditor's claim of which is hereinafter further mentioned. A hearing on questions raised at audit was held on January 11, 1966 . . .

The only question for adjudication is the claim presented at audit on behalf of Crown Nursing Home, an alleged creditor of the estate, by reason of an unpaid balance of its charges for the care and maintenance of one Bessie Fegelson, aged mother of within decedent. Liability therefor is disputed by accountant. The principal point of contention is whether or not decedent's assumption of liability in his lifetime for the costs of his mother's care survived his death and constitutes a valid claim against his estate. Secondarily, accountant also challenges the propriety of the amount claimed to be due.

On November 2, 1959, decedent had entered his mother as a resident-patient of claimant nursing home, she then being 85 years of age. Upon admission, claimant's form of registry card was filled out with certain statistical information concerning the patient, including decedent's name as the party by whom bills were to be paid. At the bottom of this registry card was the printed language: "I hereby assume responsibility for the payment of the charges as they become due", following which was subscribed decedent's signature.

The mother continued as a resident-patient of the nursing home to the date of the audit hearing herein. Although it does not appear in the evidence, it is stated in claimant's brief, and apparently agreed by account-

ant, that the mother died on January 26, 1966, 15 days after hearing. The son apparently paid claimant's charges at the rate of $50 per week until his death on May 30, 1962. Thereafter, his widow, accountant herein, in her individual capacity, continued such payments at the same rate until March 1, 1965. The significance of the latter date, if any, is not clear from the record.

On April 25, 1965, claimant transmitted a letter to decedent's widow by which it stated its purpose "to straighten out the financial aspect of your mother-in-law's stay", advised, without further specification or elaboration, that the patient "requires now the maximum of nursing care, including feeding via naso-gastric tube", noted that unpaid charges had accrued so that "There is now a balance due of $450.00—3/1 to 5/2/65", commented that unless payment be received for her care, such services could not continue to be provided, and concluded: "Whatever you contemplate doing in the future and until you make other arrangements, we respectfully ask you to discharge your obligations and inform us accordingly". This letter did not specify any new rates or express any different basis for claimant's charges in the future.

Decedent's widow apparently did nothing in response to this letter, neither resuming payments nor advising claimant in the premises. For its services in connection with Bessie Fegelson's care thereafter, claimant received only those amounts paid on her behalf by the Social Security Agency and by the Pennsylvania Department of Public Assistance. Such payments aggregated $195 per month, $52.80 from Social Security and $142.20 from the DPA, for the months of March through August, 1965, and the reduced amount of $168.40 per month, all from an increased allowance by the DPA, the Social Security payments having ceased for unexplained reasons, for the months of September, October and November, 1965. No payment was

received in December, nor in January, 1966, to the date of the audit hearing in this court.

On August 12, 1965, claimant sent another letter relative to liability for Bessie Fegelson's care and maintenance, this time to Philadelphia counsel for within decedent's estate, by name and as such in the caption of the letter, advising as follows:

"Notice is hereby given that we elect not to keep Mrs. Bessie Fegelson as a DPA recipient, but as a private patient only. That the rate for her stay at the Crown Nursing Home will be $75.00 per week to be paid in advance each week. This rate does not include medical fees, medication or medical supplies which become due and payable as the statements are rendered.

"That the estate of said Jules Fegelson, deceased, may remove, at any time, the patient, Mrs. Bessie Fegelson, the mother of Jules Fegelson, deceased, from the Crown Nursing Home and thus terminate its obligation to the Crown Nursing Home as a private patient as of the date of the transfer. All sums due to the Crown Nursing Home shall be paid to same".

Counsel's response, if any, does not appear in the record. In any event, no payments were made thereafter by accountant.

As a general rule, executors or administrators are liable on the contracts of their decedent to the extent of the assets in their hands, whether or not the contract expressly runs to them and whether the relevant breach occurs in decedent's lifetime or after his death: Stumpf's Appeal, 116 Pa. 33; Stormer Estate, 385 Pa. 382. Thus, in the instant case, the liability assumed by decedent by his signature to the printed responsibility clause on claimant's registry card would not be dissolved by his death and would extend to his estate, unless the situation presented comes within rather well defined exceptions to this general rule.

Such exceptions may be declared where a proper

interpretation of the contractual undertaking would indicate that the parties mutually intended the usual rule of the law to be inapplicable, as in the obvious case where they expressly so provided, or where they implicitly may be regarded as so intending because the very subject matter of their agreement would inherently require the furnishing of personal services involving nontransferable elements of individual skill, judgment or experience (Blakely v. Sousa (No. 1), 197 Pa. 305; George v. Richards, 361 Pa. 278), or was concerned with matters of such a nature as to render performance thereof incompatible with the settlement of the estate of a decedent or inconsistent with the duties of the personal representatives thereof (Dickinson v. Calahan's Administrators, 19 Pa. 227). See Billings's Appeal, 106 Pa. 558, 560; Young, Admrx. v. Gongaware, 275 Pa. 285, 287.

Whether or not an exception should be invoked is a matter of construction of the contract and determination of the parties' intentions: Unit Vending Corporation v. Lacas, 410 Pa. 614, 617. Silence of the agreement as to its term or duration in this respect may be regarded as creating ambiguity, which might be explained by parol: Fessman Estate, 386 Pa. 447, 451. In the instant case, however, no evidence whatsoever other than the registry card itself was introduced; we are totally uninformed as to any of the circumstances surrounding the patient's admission to the nursing home and her son's underwriting of her expenses therein, her condition of health and life expectancy as compared to his, any conversations between the parties pertinent to the present question, or other possible factors which might have been relevant in determining whether the parties intended the son's assumption of liability to be for any lesser period than his mother's full stay with claimant or whether it should be considered terminated by his death.

The son's bare legal duty of support running in his mother's favor (if indigent) may be assumed not to have continued in this case beyond his death to bind his estate; since, however, his contractual undertaking did enlarge or advance upon his liability under the law in this connection, inasmuch as he would not otherwise have been bound to maintain her in a nursing home, such contractual obligation did survive his death and would be chargeable to his estate under the general rule above stated, unless the parties' intention to the contrary be made to appear: Stumpf's Appeal, supra; Book's Estate, 297 Pa. 543, Huffman v. Huffman, 311 Pa. 123; Fessman Estate, supra; Wolfsohn v. Solms, 392 Pa. 129; Scott Estate, 394 Pa. 39. While the registry card language did not in terms purport to bind decedent's personal representatives, and the absence of such language is not totally without significance (Unit Vending Corporation v. Lacas, supra), that circumstance is not necessarily controlling alone and of itself (Young, Admrx. v. Gongaware, supra). Here the inference seems reasonable, in the total absence of inconsistent evidence, that claimant intended to request, and decedent intended to furnish, a guarantee on the part of the latter that so long as his mother remained in the nursing home, he would be "responsible" for proper charges for her care and maintenance. In view of her age, and the fact that he was her son, the parties would normally be assumed to have understood that this obligation on his part would survive and cover her entire stay, regardless of his own possibly premature death.

Accordingly, the auditing judge believes that within decedent's estate is legally liable under the general rule by reason of decedent's assumption of unqualified "responsibility" in his lifetime. The next question, of course, is to determine the extent and amount of that liability. On this score, claimant runs into difficulties

by reason of the inadequacies of its proofs. It has offered no evidential foundation whatsoever to substantiate its claim at the rate of $355 per month, less credits for the Social Security and DPA payments for the period covering the months of May to August, 1965. Accordingly, down to the date of its August 12th letter, claimant is entitled to recover herein only the difference between the amount falling due at the prior (and apparently conceded) rate of $50 per week from March 1, 1965, to August 12, 1965, or, 24 weeks, for a total of $1,200, and the total payments received during that period, or, six months at $195, for a total of $1,170, the difference amounting to $30.

As to the period subsequent to August 12, 1965, claimant's letter of that date constituted an offer of a new and express contractual arrangement with the estate, which executrix, by her non-removal and acquiescence in claimant's continuing care of the patient thereafter, may be considered under the circumstances to have accepted in legal contemplation, so as to effect a change from that time forward in the measure of liability for the senior Mrs. Fegelson's maintenance pursuant to the continuing obligation of decedent's inter vivos undertaking relative thereto.

Accordingly, for the 22 weeks accruing from August 12, 1965, to January 11, 1966, the date of hearing herein, claimant would be entitled at the rate of $75 per week, or, a total of $1,650, less a credit for $505.20, the DPA payments received for September, October and November, or, a net amount of $1,144.80.

The claim for an additional $30 per month, apparently asserted as an average approximation for extra medical fees and supplies, is hereby denied for lack of substantiation. The letter of August 12, 1965, after specifying the $75 weekly charge, further adds: "This rate does not include medical fees, medication or medical supplies which become due and payable as the state-

ments are rendered". So far as the record shows, no statements were rendered in this connection, nor was any particular showing made whatsoever at the hearing of amounts actually incurred therefor.

In summary, then, claimant Crown Nursing Home is entitled to receive from the within estate the sum of $1,174.80 for care and maintenance of Bessie Fegelson down to the date of hearing herein on January 11, 1966, plus the net amount thereafter accruing in accordance with the foregoing discussion to the date of her death on January 26, 1966, if she, in fact, did die on the latter date. It is to be hoped that counsel may amicably agree on the latter amount; if they cannot, however, a further hearing will be held on application.

The auditing judge is unable to make any disposition of another possible creditor's claim against the within estate. On September 20, 1963, pursuant to section 732(b)(2) of the Fiduciaries Act of April 18, 1949, P. L. 512, as amended, 20 PS §320.732(b)(2), the County of Bucks, Personal Property Tax Department, filed with the clerk of this court a written statement and notice of its claim for personal property taxes alleged to be due from decedent in his lifetime and remaining unpaid. What disposition of this claim has been made by accountant, if any, does not appear in the record. While the claim was not asserted at audit, accountant gave no notice of audit to this claimant. Accordingly, it remains open and judicially undetermined. For this reason, the within adjudication and the awards to the beneficiaries under decedent's will herein ratified or authorized and approved are expressly made at accountant's risk with respect thereto, and subject to the remaining rights of the County of Bucks, if any, by reason of said claim and any interest and penalties in fact due thereon. . .

And now, April 29, 1966, the within adjudication is directed to be filed and is hereby confirmed nisi. The

286

within adjudication shall become the final decision of the court unless exceptions be filed hereto, pursuant to the present rules of practice of this court, within 10 days from this date.