# Billings's Appeal.

1. A contract for the cutting of timber which does not necessarily involve the personal skill or expert knowledge of the contractor, and which by its terms is extended to the heirs, executors and administrators of the parties, and which can be completed within a reasonable time, survives the death of one or both the contracting parties.

2. In such case the life tenant and the personal representatives of the deceased contractor are not chargeable as for waste by cutting timber, in continuing to fulfil such contract, according to its terms, after the death of the parties thereto.

3. Where all the parties interested in said lands were consulted as to the mode of continuing the execution of the contract, after the death of the parties thereto, and assented to the cutting of timber in pursuance thereof, such parties are estopped from subsequently seeking to enjoin the further cutting of timber, by averring that the contract terminated at the death of said parties.

May 12, 1884. Before MERCUR, C. J., PAXSON, TRUNKEY, STERRETT and CLARK, JJ. GORDON and GREEN, JJ., absent.

APPEAL from the Court of Common Pleas of *Tioga county:* In Equity: Of January Term, 1884, No. 420.

This was a bill in equity filed by Charles F. Billings and Abbey B. McNeil, against Sarah M. Billings, Jefferson Harrison and William Putnam, praying for an injunction to restrain the defendants from committing waste by cutting timber on certain lands, and for an account of timber cut.

An answer was filed, and the cause was referred to an examiner, and subsequently to a Master, who reported a decree dismissing the bill. Exceptions filed by the complainants were dismissed by the court, and a decree dismissing the bill was entered in accordance with the recommendation of the Master. The facts of the case are clearly stated in the opinion of this court. The complainants took this appeal, assigning for error the said decree.

*Stephen F. Wilson (Jerome B. Niles* with him), for the appellants.

*Buckalew* and *Elliott* (with them *Watrous*), for the appellees.

Mr. Justice CLARK delivered the opinion of the court, October 6, 1884.

Silas X. Billings, who died intestate, on the 13th day of October, 1879, was, at the time of his death, the owner in fee of certain tracts of land, situate in the counties of Tioga and

Potter, containing in the aggregate 38,157 acres. He left to survive him a widow, Sarah M. Billings, a brother, Charles F. Billings, and a sister, Abbie, wife of P. S. S. McNeil, the brother and sister named, being of the whole blood, and other brothers and sisters of the half blood.

In his lifetime, on the 25th September, 1879, he entered into a written contract with Henry Colton, to cut the pine timber on about 5,000 acres of the land, and deliver it into the boom at Williamsport, on certain terms in the contract mentioned; on the same day in the presence of Billings, Colton contracted with William Putnam, for the performance of part of the work. About the first day of October, 1879, Colton or Putnam, pursuant to the contract, and at large expense, began the cutting out and repairing of the roads, building of camps, &c. Billings, as we have stated, died on the 13th October, 1879. Henry Colton also died on the 10th day of August, 1880, having first made his last will and testament, in which, after appointing Jefferson Harrison the executor thereof, he authorized the said executor " to continue the work, under the contract made, as aforesaid, with Silas X. Billings, and to execute the said contract according to its true intent and meaning, as fully and to the same extent, as the testator could do if living."

Under a partition which was afterwards made of the lands of said Silas X. Billings, between the widow and heirs, about 19,000 acres, including the lands, the timber upon which was the subject of the Colton contract, were on the 24th March, 1881, allotted as dower, and set apart to the widow for life.

The plaintiffs in this case are the heirs at law of the full blood of Silas X. Billings, deceased; the defendants, Sarah M. Billings and Jefferson Harrison, are the legal representatives of the original parties to the agreement of 25th September, 1879, whilst William Putnam is the employee of Harrison.

The bill charges the commission of waste in the removal of the pine timber from the 5,000 acres aforesaid, embraced within the boundary set apart to the widow, and the prayer of the bill is for an injunction, also for an account of the proceeds in the defendants' hands. The right to an account, however, is predicated of the waste, and it follows that if the defendants have committed no waste, there can be no decree for an account.

The plaintiffs maintain that the contract under which the defendants assume to act is personal in its character; that it provides for the performance of such services, and the exercise of such personal skill and experience upon the part of Colton, in the matters involved, as necessarily limited its performance to Colton himself; and, further, that the contract is such that

at the death of Billings, its continuance devolved such duties, and created such obligations upon his legal representatives as are inconsistent with the settlement of his estate; that, therefore, the survival of the contract was necessarily not in contemplation of the parties at the time of its execution. It is urged, therefore, that upon the death of either party, the obligation of the contract ceased as to both.

It is certainly true that the rights and responsibilities of executors and administrators depend, in many cases, upon the relations of the original parties; the former do not, in all cases, succeed to the contracts of the latter; what may be termed mere contract, personal relations do not survive. Where the agreement is for services which involve the peculiar skill of an expert, by whom alone the particular work in contemplation of the parties can be performed, or more generally, where distinctly personal considerations are at the foundation of the contract, the relation of the parties is dissolved by the death of him whose personal qualities constituted the particular inducement to the contract. The *casus* must be such, however, as to wholly prevent the performance of the contract; what is impossible to be done cannot be required to be done, and a subsequent intervening incapacity will, in such case, work a dissolution of the contract.

. But where a party agrees to do that which does not necessarily require him to perform in person, that which he may, by assignment of his contract or otherwise, employ others to do, we may fairly infer, unless otherwise expressed, that a mere personal relation was not contemplated. It is true also, perhaps, that a contract may involve matters of such a nature as to render the performance of them so incompatible with the settlement of a decedent's estate, and so inconsistent with the general duties of an administrator or executor that, in the absence of any express provision to the contrary, the parties may be presumed, as in the case of Dickinson *v.* Calahan's Administrator, 7 Harris, 227, to have intended its dissolution at death. The whole question, in each case, is one for construction, and depends upon the intention of the parties, that intention to be found under the rules regulating the construction of contracts in general. Resorting, in the first instance, to the instrument itself, we find there an express provision "that for the faithful performance of each and every the covenants and agreements aforesaid, each of said parties doth bind himself, his heirs, executors and administrators, to the other his heirs, executors and administrators, firmly by these presents."

In this respect Dickinson· *v.* Calahan's Administrator is clearly distinguishable from the case at bar; the contract there exhibited nothing upon its face which indicated any purpose

of the parties, that, in case of death, their legal representatives should succeed to their rights, and incur the obligation of a full and continuous performance of the contract. We discover nothing in the nature of the obligations assumed, or of the duties to be performed on either side, that would tend to create any merely personal relation between the parties, or involve such a performance as would indicate that a survival of the contract was not in contemplation; a contrary intention, however, is distinctly shown by the subsequent conduct of the parties. On the same day on which the contract was executed, Colton made an agreement with Putnam in the presence, and with the apparent concurrence of Billings, by the terms of which Putnam agreed to cut and deliver the said timber at the mouth of State Run, ready for floating; Putnam began the work on the 1st October, 1879, and, during the lifetime of Billings and with his knowledge, built camps, constructed and repaired roads, &c., &c. After Billings' death, and until the commencement of this suit, he continued cutting and stocking the timber from year to year, with the knowledge of the plaintiffs, and without objection on their part. In the winter of 1879–80 he delivered into the boom at Williamsport 3,100,000 feet of logs; in the winter of 1880–81, 5,412,000 feet, and in the winter of 1881–82, 4,756,000 feet; it is estimated that about 2,150,000 feet remain, and at the filing of this bill Harrison and Putnam were proceeding to cut and deliver this remaining timber into the boom at Williamsport, in accordance with the original contract.

The Master finds that the plaintiffs had a general knowledge of what Putnam was doing upon the lands from time to time as the work progressed; and, that up to the bringing of this suit they made no objection, either to the cutting, transportation or delivery of the timber pursuant to the Colton contract, although they did object to the subsequent disposition of the timber, and of its proceeds. Indeed, it appears that after the death of Colton, at the instance of his executor, various meetings of the parties in interest were held for consultation as to the execution of the contract. At one of these meetings, held in September, 1880, the plaintiffs were present and stated that "they wished the Colton contract carried out as it read," and that on the delivery of the logs at Williamsport in the boom, they would determine as to what disposition should be made of them; at another held in August, 1881, Mr. Harrison reported what had been done up to that time, and stated what he intended to do in the ensuing season, all of which was received as satisfactory.

It seems clear, not only that Silas X. Billings and Henry Colton, but their heirs and representatives, since their decease,

10 OUTERBRIDGE.—36.

by. their acts and acquiescence, have uniformly interpreted this contract as one which did not involve a merely personal relation. From the words of the contract itself, therefore, from the nature of the subject matter it contains, and from the concurrent acts of the parties, we are led unmistakably to the same conclusion.

But if this were not so, the present plaintiffs, by their acts already referred to, are certainly precluded from asserting as waste, that which was done under a supposed right, not only by their leave, but upon their request. However we may view. this case, we must conclude that the removal of the timber was a rightful removal, and cannot be characterized as waste.

It is unnecessary now to consider any question of distribution; no such question is presented upon this record; if the defendants Harrison and Putnam had the right to remove the timber, they were not guilty of waste in so doing; and as Sarah M. Billings was powerless to prevent the removal, no act of waste can be charged against her in suffering it to be done. What are the rights of the life tenant in timber thus rightfully cut on timber lands in her possession; who is entitled to receive the proceeds, or what disposition or distribution should be made of such proceeds, are questions not now before us.

The decree is affirmed, and appeal dismissed at the cost of the appellant.