## Blakely *v.* Sousa (No. 1).

197    305
22 SC ²348

197    305
138SC ¹459

*Contract—Subject-matter—Ceasing of an existing relation.*

All contracts must be construed with reference to their subject-matter, and a contract defining an existing relation can have no operation when that relation ceases, for its foundation is gone.

*Contracts—Personal qualities of contracting party.*

Where an agreement is for services which involve the peculiar skill of an expert by whom alone the particular work in contemplation of the parties can be performed, or, more generally, where distinctly personal considerations are at the foundation of the contract, the relation of the parties is dissolved by the death of him whose personal qualities constituted the particular inducement to the contract.

Where a bandmaster of known musical ability makes an agreement with a man of great and well-known business ability in managing musical organizations, by which agreement the former is to be the leader of a band, and the latter its business manager, and it appears, both from the contract and from extrinsic evidence, that the personal qualities of the two men were an important consideration with the parties in making the contract, the death of the business manager ends the contract, and his personal representatives have no right to substitute a manager in his place. In such a case it is immaterial that the contract provided that if the parties formed a corporation, the contract might be assigned to it.

*Trade-mark—Trade name—Name of musician.*

The name of an artist, an author, a musician, or a lawyer has never been regarded as a trade name, and as such, salable. The value of the name of such person depends entirely upon his personal reputation, skill and experience, and is indissolubly connected or associated with the owner.

Where a bandmaster of great musical ability has given his name to a band, and the band has become celebrated under that name, the representatives of the deceased manager under whom the bandmaster was engaged, have no right to the use of the bandmaster's name after the death of the manager.

MITCHELL, J., dissents.

Argued Jan. 22, 1900. Appeal, No. 353, Jan. T., 1899, by plaintiff, from decree of C. P. No. 2, Phila. Co., March T., 1897, No. 1365, dismissing exceptions to report of referee, in case of Ada P. Blakely, individually, and as administratrix of David Blakely, deceased, v. John Philip Sousa. Before McCOLLUM, MITCHELL, FELL, BROWN and MESTREZAT, JJ. Affirmed.

Bill in equity for an injunction.

Exceptions to report of referee, Charles E. Morgan, Esq.
The referee found the facts to be as follows :

### FINDING OF FACTS.

1. David Blakely, who was a manager of musical organiza-
tions, possessing, as stated in the bill of complaint, " large ex-
perience and great reputation for his success in these enter-
prises, especially in their organization," on June 27, 1892, en-
tered into the contract, exhibit " A, " with John Philip Sousa,
the defendant, a musician well and favorably known, and of
reputation and experience as a leader of bands.

Prior to June 8, 1892, Blakely and Sousa, as appears from
the letter of the former to the latter of that date, contemplated
entering into an arrangement for the purpose of carrying on
together in some manner a musical organization through a cor-
poration to be created. The latter course, evidently, was not
regarded as essential or fixed, and its adoption or rejection was
intended to be left to the election of Blakely.   In the said let-
ter written by him to Sousa, he says : " I enclose herewith a
draft of the proposed contract between you and me, to be suc-
ceeded by a like contract by the company which I am organiz-
ing for the purpose of succeeding me in this business.   But if
for any reason the company referred to should fail of organiza-
tion, then this individual contract is to remain in force as
specified by its terms.   I have got in all the provisions that we
talked about or that have occurred to me."

On the day of the date of the contract, exhibit " A," such a
corporation was formed under the laws of the state of New
Jersey, called the " Blakely Syndicate," of which Mr. Blakely
was president, and in which defendant became a stockholder.

This corporation was abandoned and the defendant's stock
surrendered to Mr. Blakely on or about May 12, 1894.

2. The personal qualities of each of the parties, Blakely and
Sousa, constituted a potential inducement to the making of the
said contract.

Blakely relied upon Sousa's ability as a musical director, and
Sousa upon Blakely's skill, experience, reputation, and success
in the organization and management of musical organizations.
This appears from the plaintiff's averment in her bill, where she
states that " prior to the execution of the contract hereinafter

recited, said David Blakely was engaged in organizing, owning and managing musical organizations, in which he had gained large experience and great reputation for his success in these enterprises, especially in their organization . . . . possessed of considerable capital and having the advantage of his experience as business manager of the United States Marine Band and of Gilmore's Band, both musical organizations of great reputation, he applied himself to the work of effecting the new organization." In the recital at the commencement of the agreement (exhibit " A ") Blakely is described as " the manager of the late tours of the United States Marine Band."

Benjamin Stevens testified that he had known Mr. Blakely from about 1892 as manager of Mr. Gilmore and connected in concert enterprises with Mr. Sousa ; that he was " always looked upon as a very brilliant manager." Mr. Stevens had been a manager and connected with operatic enterprises as such for about eleven years.

Abram W. Erlanger, who had been a manager, and had had experience in booking and managing musical organizations in the United States, states that he had known David Blakely for about seven years and had business relations with him in relation to Sousa's Band, and that he was regarded as, and had, the general reputation of being pre-eminent among managers of musical organizations.

3. On May 21, 1895, Blakely, in a letter of that date addressed to defendant, voluntarily, and without consideration from the defendant, promised to make him, from and after August 1, 1895, an equal sharer with himself in the profits of the business, reserving, however, the right to withdraw this concession at any time, and expressly stipulating that it should not be considered " a legal amendment or appendage " to the contract as originally executed. He writes : " It is not my purpose to meddle with that, or to put it absolutely out of my power to resume its conditions. But I can now imagine no circumstance which will cause me to change the voluntary conclusion to which I have come, that at the time specified you and I will share alike in all the revenues which are derived from the enterprise which we undertook together and have thus far carried forward to an unexpected and gratifying success."

He also on May 7, 1896, evidently referring to the same subject, wrote defendant: "What I have done or proposed to do in connection with the division which I am now making and the surrender which I propose to make of all interest in the royalties coming from the performances of your opera are conditioned upon the continuance of our relation."

On September 10, 1896, Blakely and the defendant made the written agreement of that date (exhibit "F" of plaintiff's bill, to renew for three years from August 1, 1897, "their present contract," expressly excluding from it the question of the division of royalties upon music provided for in exhibit "A."

4. On July 31, 1895, Blakely wrote the defendant as follows: "Hereafter the books will be carried on upon the basis of a strict division of profits without regard to salaries, your salary and mine going in as profits, but if it should so happen that the profits should amount to less than your salary of course the difference will be made up to you. But this is practically an impossible event. Let our statements show the profits of our partnership, just the same as in all other like cases. It is hardly fair to take out $12,000 of our margins before considering that we are making any money on the band."

After August 3, 1895, the books of the band show no payment of salary to either Blakely or defendant, but simply an equal division of profits.

On August 2, 1895, October 24, 1896, and October 30, 1896, Blakely wrote to defendant, addressing him as "My beloved partner," or "My dear partner."

5. On September 10, 1896, Blakely and defendant entered into the contract, exhibit "F."

6. On November 7, 1896, Blakely died intestate, and soon thereafter letters of administration upon his estate were duly issued to the plaintiff. Defendant was at this time in Europe. On his return he called upon and notified the plaintiff that he was advised and believed that the contract existing between him and Mr. Blakely was terminated by the latter's death, and refused to continue as musical director of Sousa's Band thereunder; and about the same time an oral agreement was entered into by the defendant with the plaintiff that the defendant should continue to lead the band as musical director throughout a tour which had been arranged by Mr. Blakely for 1897

and direct the performances of the engagements made, contracted for, and advertised by Mr. Blakely, the last of said engagements so arranged and contracted for being May 23, 1897. It was then agreed and understood by both parties that the arrangement then made should not prejudice either in the subsequent determination of the meaning and effect of the contract of June 27, 1892, and that of September 10, 1896, and that its purpose was to provide for carrying out the engagements for the band made by Mr. Blakely, for the benefit of both plaintiff and defendant. Under said oral contract the plaintiff was to employ all the members of the band and officers, pay all the salaries, receive all the receipts, pay expenses, and account for and pay to defendant compensation in accordance with the terms of the contract between him and Mr. Blakely as it existed at the time of Blakely's death. As to the dates and manner of payment to defendant of his share of net profits, the testimony is contradictory and unsatisfactory. I find that it was not agreed that he should receive payments on account of the same from time to time before the end of the tour of the band unless and until the tour proved in fact profitable. He was in any event, however, to receive on account of salary from Mrs. Blakely, $115 per week. It was further agreed that the question of the rights of the defendant and the plaintiff to royalties from the sale of defendant's music should be determined after the contemplated tour was finished, and that in the mean while the proceeds of such sales should be deposited with Vernon M. Davis, Esq., of counsel, for the defendant, as trustee.

7. On or about December 26, 1896, the band started out on the tour as arranged by Mr. Blakely, with Mr. Sousa as musical director, Mr. Christianer as manager, Mr. Strine as press agent, engaged by plaintiff, with defendant's approval. At Philadelphia Mr. Sousa drew, at the end of the first week, $215. At Savannah, which was the next place on the tour, he received, at the end of the second week, $215. At New Orleans the defendant received copies of letters to the John Church Company, publishers, of December 26, 1896, and March 6, 1896 written by Mr. Low. When the band arrived in Memphis, Mr. Christianer told the defendant that he had received an order from Low to pay him, defendant, $115 a week and no more,

and refused to pay him any more. This occurred on January 20, 1897. Again, at Denver, on February 12, 1897, Christianer refused to pay more than $115. Mr. Christianer was then treasurer of the band. In the mean time, in the first week in February, the defendant consulted Mr. Redding, his counsel, at Chicago, about the matter, and he advised him to take a "heroic stand," and when the defendant reached Denver and joined the band, he demanded of Christianer, the treasurer $215 per week for several weeks which had elapsed since the last payment. Christianer refused to make the payment, saying, "No, I can't do it, Sousa. Low has told me I can't do it, and I won't do it." Whereupon Sousa replied that he would not go on unless he received $2,500. A statement received that day by Sousa, from Miss Allen, Mrs. Blakely's bookkeeper, shows that the profits of the tour up to that time were $7,000. After some conversation, Christianer gave him the money demanded, $2,500. At Jackson, Mich., a letter was received by defendant from Mr. Low. Defendant then made another demand on Christianer for $2,500, and received it, Christianer advising Mrs. Blakely by letter received by her bookkeeper, Miss Allen, dated March 19, 1897, of said demand and payment. In consequence of this, Mr. Low wrote letters of March 23, 1897, to Christianer and defendant, respectively, to the effect that the said payments of $2,500 each, were without the authority and approval of Mrs. Blakely, and referring to a telegram to the same effect sent to Christianer by him, directing him to pay Sousa nothing except as instructed in his (Low's) previous letters.

With the defendant as musical director and under the plaintiff's business management, the band performed the engagements contracted for by Mr. Blakely until April 6, 1897. On April 6, 1897, the defendant ceased further to act under said oral agreement as musical director of the band, hired its members in his own name and for his own benefit and proceeded to give concerts following April 6, for his own profit, using for this purpose the name of the band, the musicians engaged by Mr. and Mrs. Blakely, and the band music or library, without the plaintiff's consent.

8. The plaintiff has received nothing on account of royalties from Mr. Sousa's musical compositions since her husband's

death; all moneys, however, received from this source to November 1, 1896, were equally divided between Mr. Blakely and defendant.

9. Part of the band library is now in plaintiff's possession, part in storage, and part in the possession and use of defendant, who has not accounted to her for its use.

10. On April 1, 1897, Mr. Davis, as attorney for Mr. Sousa, wrote Mr. Low the letter, in which he stated that the defendant would appear only at places contracted for by Mr. Blakely during his lifetime, and that he did not recognize the claim or right of Blakely's representatives to contract for his appearance at any time or place.

On April 2, 1897, Mr. Low wrote Mr. Davis that if engagements at Yonkers and Newark had been substituted for those made by Mr. Blakely for April 6 and 7, Mr. Sousa must play on those dates in those places or be held responsible for damages to Mrs. Blakely, and that the same course would be pursued with reference to any engagements made for the band by Mrs. Blakely's representative during the continuation of the contract.

On April 5, at Mr. Low's request Mr. Christianer met him in New York after the return of the band and received from him the letter notifying him that he (Christianer) was discharged by Mrs. Blakely from her employment for acts alleged to be in excess of his authority, contrary to instructions from her and in violation of his trust as her representative, and demanding the surrender to Low, as her attorney, of all contracts, letters, and papers and other property relating to the band received by him as her agent, and an account for all moneys also received while so acting.

On April 6, 1897, Christianer wrote Low a letter in which he denied that he had done anything to justify the termination of his contract with plaintiff, insisting that he had performed his duties faithfully, asserting his readiness to continue to perform his part of the contract, advising her that " he would demand an account of the profits of the tour, and payment of the amount payable to him, under the terms of his contract, from January 1, to August 1, 1897, and notifying her that he had placed in his name as trustee at a bank in the city of New York the sum of $3,000, balance in his hands from concerts thereto-

fore given by Sousa's Band; and that this amount would remain so deposited until his rights under the contract were adjusted "either amicably or by the court."

On April 7, 1897, the defendant wrote Mr. Low the letter of that date, advising him that he (Sousa) had been informed that Christianer had been discharged and that Strine had been substituted in his place, and that Strine was not acceptable to Sousa as business manager, and on the same day Low replied, representing that Strine was not personally acceptable to Sousa, disclaiming any knowledge by Mrs. Blakely that such was the case, and informing him that Christianer was discharged for "wilful disobedience and gross breach of trust."

11. The last concert played by Sousa's Band under the business management of Mrs. Blakeley was at Brooklyn, April 5, 1897. On April 8, 1897, the band played two concerts, one at Bethlehem and the other at Allentown, under the management of Mr. Sousa, who did not account to Mrs. Blakely for the proceeds of same, or for the proceeds of any concert subsequent to that date, nor has he since in any way recognized Mrs. Blakely as representing an interest in the band, nor sent her any communication with reference thereto. In fact, from and after April 6, the business of Sousa's Band has been conducted by Mr. Sousa as his own in every respect, without recognition of any interest whatever in the estate of Mr. Blakely. No account has ever been settled between them as to any of the performances of the band since Mr. Blakely's death, although all the proceeds of the concerts given by it thereafter and before April 6, 1897, except $3,000 referred to in Christianer's letter to Mr. Low, have been paid to Mrs. Blakely, less the expenses and salaries, and the amounts referred to, paid to defendant, or obtained by him from Christianer.

12. The agreement as to the payment of the royalties to Mr. Davis was not carried out. Before Blakely's death these had been always paid to defendant by the John Church Company, whose contract was with him, defendant paying Blakely. Mr. Low, after the agreement to deposit was made, notified the Church Company of it and advised them that payments should be made only to the trustee. The church company sent to defendant a copy of this letter and also their reply, informing Low that their contract was with defendant, and declining to

pay the royalties to any one else. Thereafter payments of the same were made to defendant and the moneys thus received were retained by him. No portion of them has been paid to Davis, the trustee, nor accounted for to the plaintiff.

## OPINION.

1. At the time of the death of David Blakely, on November 7, 1896, there existed between him and the defendant a contractual relation under the written agreement of June 27, 1892, (exhibit "A") which was not a copartnership, but an employment of defendant by Blakely as his, Blakely's, musical director of his musical band, for a specified compensation to be paid by him, for which, in the event of default, he could have been sued at law; Blakely assuming, individually, all risks of loss and the payment of all debts to be incurred, including the salary of $6,000 per annum to be paid defendant.

The rule established by the cases to the effect that the right to a division of profits carries with it a presumption of a copartnership relation, is for the benefit and protection of parties other than those so contracting. There is no legal limit to the power of two or more persons to contract together so as to provide for a division of profits of a business without conferring the rights or imposing the responsibilities incident to a partnership upon them inter sese. See Lindley on Partnership, page 20, and Ryder v. Jacobs, 182 Pa. 624.

It is true that where the intent is difficult to ascertain from the language used, a clause providing for a division of profits should be considered and given weight in determining whether the contract was intended to be a copartnership agreement. Such a clause of itself, however, has never been held to be sufficient to impose, as between the parties, partnership liabilities under a contract which in other respects expresses an intent to form a different relation.

In a partnership all the partners are principals, and each is agent for all. These conditions are not to be found in the contract between Blakely and Sousa.

This will readily be seen upon examination of exhibit "A." The intent to contract together as employer and employee is patent upon the language used throughout it. Sousa was to obey Blakely, to be subject to his orders not only in the lead-

ership of Blakely's Band, but also in relation to musical performances by other organizations.

The defendant agreed " to rehearse and conduct any respectable organization composed of individuals of musical excellence whenever requested by the said Blakely, and to devote his time to the business interests of the said Blakely in this connection by his musical accomplishments and work," " and not to engage in any musical or other work not connected with this engagement without the written agreement of the said Blakely."

I have found as facts that at various times after the date of their contract Blakely, in his correspondence with defendant, addressed him as his " dear " or " beloved " partner, and also once referred to their existing relations as a " partnership." Precisely what he meant by the use of these expressions it is difficult to determine. If taken in their literal sense they do not describe accurately the contract relations of the parties as shown by the only evidence before me. As against the unambiguous words of the written agreements and the intent thereby clearly shown, these expressions are entitled to but little consideration.

The following are copies of said agreements, exhibit " A " and exhibit " F : "

### " EXHIBIT ' A.'

" Whereas Mr. David Blakely, the manager of the late tours of the U. S. Marine Band, is desirous of perfecting a new organization for the purpose of securing high excellence in a military band, and with that view to secure the services of Mr. John Philip Sousa as its musical director, and said John Philip Sousa is willing, on the terms hereinafter expressed, to accept said employment and position.

" This agreement between said parties witnesseth as follows :

" 1. It is agreed that the said David Blakely shall be the business manager of the said band, in connection with his assistant managers or agents, and shall perform all acts and duties pertaining thereto, and shall be solely responsible for all expenses connected therewith, the said John Philip Sousa not to be liable in any event for any portion thereof.

" 2. It is agreed that John Philip Sousa shall be the musical

director of the said band, and shall perform all acts and duties pertaining thereto, and that the organization shall be known as Sousa's Band, or shall have some title chosen by said Blakely with the name of Sousa as a part thereof. Said name shall thereafter be a part of the property of said band, and be owned and controlled by the business manager thereof, or his successors and assigns.

" 3. It is agreed that this contract shall take effect from the date of the acceptance of said Sousa's resignation as leader of the U. S. Marine Band, and severance of his connection therewith, and continue for the full term of five years thereafter.

" 4. It is agreed that the compensation of the said Sousa for the duties connected with his position as hereinafter mentioned during said period, shall be at the rate of $6,000 per year, from the time of his severance of connection with the U. S. Marine Service until the expiration of this contract, payable monthly by said Blakely, and, in addition thereto, ten per cent of the net profits of the business of the organization during the first year after the date of the organization of the band, and twenty per cent during the remainder of this engagement, also payable by said Blakely. The said net profits to be the remainder of moneys on hand at the expiration of the first year, after deducting all expenses of conducting the band and its business, and including the aforesaid salary of the musical director, and a like annual salary of $6,000 to the said Blakely or his successor as business manager of the said new organization; and the said musical director shall receive twenty per cent of the said so described profits for the remaining years of the duration of this contract, after deducting all expenses, including salaries as aforesaid. And said Blakely will pay for first-class railroad transportation on all tours made by said Sousa in connection with said band.

" 5. The said John Philip Sousa, after the expiration of this contract, shall give the said David Blakely the refusal of his services in a similar capacity for another five years; provided the said Blakely shall agree to pay him as great a compensation as any other manager in good faith offers to do.

" 6. The work of securing the said new organization shall begin as soon as may be after the signing of this contract.

" 7. The number of musicians engaged for concert tours

shall not be less than forty-six, unless agreed to by both Blakely and Sousa.

" 8. It shall be the aim and duty of the said Sousa by individual effort, and band rehearsal and practice, and by the preparation and furnishing of music, to make this band equal in executive ability to the band of the Garde Republicaine in Paris.

" 9. The musical direction of the aforesaid organization shall be in the hands of the said John Philip Sousa, and the business management in the hands of the said Blakely as aforesaid, but both shall mutually receive counsel in their respective positions, and especially regarding the preparation of programmes. It shall be the effort of the musical director to make programmes, which, while embodying a good class of music, shall be popular and pleasing, and have regard to business success.

" 10. The salaries to be paid to the musicians shall be paid by the business management, but the director may at all times advise and counsel the business management in this particular.

" 11. The musical director shall conduct as many concerts or other engagements, as are arranged for, or as the men are willing to play, but shall be entitled to one month's leave of absence in each calendar year, at a time or times when the band is not engaged on the road or otherwise, and the compensation of said Sousa shall not cease or be diminished by reason of such leave or any other cessation of work by said band.

" 12. The musical director shall, whenever able to do so in times of leisure, or when not occupied in conducting the band (except during such leave), rehearse and conduct any respectable organization composed of individuals of musical excellence, whenever requested by the said Blakely; and shall generally devote his time to the furtherance of the business interests of the said Blakely in this connection by his musical accomplishments and work; and in case of any musical compositions by said Sousa during or prior to said period, the profits of the sale or negotiation of any such musical compositions, and all other music now controlled by the said Sousa, or composed by him during or prior to this engagement, including his 'Sheridan's Ride,' 'Ben Hur,' etc. (already composed), shall be divided equally between the parties of this agreement; the publication of these, if published by him, to be at the expense of said Blakely,

said expense to be deducted from the receipts of the sales of said music before any division of profits shall be made.

"13. The said Sousa, party of the second part, agrees to transfer and deliver, and hereby does transfer to the said Blakely, party of the first part, as aforesaid, the original scores and orchestra music, or copies of the sameof all of his own musical library of band music; and such scores and music, or copies of all music of this class, composed, arranged, purchased, or in any way heretofore acquired, or to be acquired, for the use of said band, during the force of this agreement, shall be the property of the party of the first part, as a part of the permanent library of said band.

"14. Should, for any reason, the said Sousa return to the government service, or resume his position as leader of the Marine Band, or other organization, or engage in other business, then this contract shall cease and determine. But the said Sousa shall not so return or accept the direction of any other organization not herein specified, or engage in any musical or other work not connected with this engagement, without the written agreement of the said David Blakely.

"15. It is agreed that both parties to this agreement shall do all that within them lies to make the enterprise herein contemplated a success, both musically and financially; and, in general, they shall both spare no pains to forward the interests of the business connected directly and indirectly therewith.

"16. In addition to conducting the concerts arranged for by the business management, the said John Philip Sousa shall conduct at all expositions, watering places, or other reputable engagements arranged for by the said David Blakely.

"17. It is hereby further understood and agreed that in case of and as soon as the said David Blakely shall have perfected, and there shall have been organized, a stock company for the carrying out of the agreements herein set forth, this contract may be assigned to said company by said Blakely, and in case of its acceptance by said company, and its agreement to carry out its provisions, it shall become the principal in the fulfillment of this contract in the place of the said David Blakely. But in case the said corporation shall not be formed, then it is understood and agreed that this contract shall be maintained intact by and be in full force as to both parties, as herein signed and executed.

"In witness whereof, the parties hereto have signed their names and affixed their seals, in duplicate, this 27th day of June, A. D. 1892.

"DAVID BLAKELY,   [Seal.]

"JOHN PHILIP SOUSA.   [Seal.]

"Witness:

"HOWARD PEW,

"FRANK CHRISTIANER."

"EXHIBIT 'F.'

"NEW YORK, Sept. 10, 1896.

"It is hereby agreed, by the undersigned, that after the expiration of the present contract, August 1, 1897, they will renew the same for three years, on a basis of an exact division of the profits of the band, after deducting expenses. It may be continued thereafter on the same basis, but only by mutual agreement, and be terminated by either party at any time, or at the end of any tour made by the band subsequent to the expiration of the new contract.

"The question of the division of royalties shall be an independent one, and shall be discussed and settled purely upon its merits, by amicable mutual agreement; but not before the return of Mr. Sousa from Europe; and whatever may be decided thereupon, shall have no bearing upon the arrangement hereby agreed to regarding the band.

"JOHN PHILIP SOUSA,

"D. BLAKELY."

2. The relation of employer and employee existing under said contract of June 27, 1892 (exhibit "A"), extended by the subsequent agreement of September 10, 1896 (exhibit "F"), between Blakely and the defendant, was terminated by the death of Blakely on November 7, 1896.

Blakely's business qualities, ability and reputation, as well as the musical talent of Sousa, were evidently regarded by both parties as essential to the success of the enterprise, and upon this success depended a portion of the compensation which was to be paid to Sousa, to wit: his proportion of the annual net profits.

It is well settled that in cases of employment of a servant by a master, where the personal qualities of each are relied upon,

and form a part of the inducement to the contract, it is dissolved by the death of either, and does not survive to the legal representatives of either unless the contract between them so expressly provides.

In all contracts of this character there is written by the law the condition that they are subject to the continuance of the lives of the parties contracting. It would hardly be contended for a moment that if Sousa had died and Blakely had survived, Blakely could have been compelled to accept in lieu of Sousa's services, the services of his legal representatives or of any one selected by them.

It is equally clear that if plaintiff had declined to continue to conduct the band after Blakely's death, she could not have been compelled so to do by Sousa, nor would she have been liable in damages for any loss accruing to him because of her refusal. The death of either party to the contract would have brought about its termination: Yerrington v. Green, 7 R. I. 589.

The death of an employer who by contract has retained a clerk and salesman in his business for the term of three years at a salary, before the expiration of the stipulated term of service excuses the further performance of the contract; and no action can be maintained against the administrators of the employer for their refusal to employ the clerk and salesman.

Chief Justice AMES, who delivered the opinion of the court, says (page 594):

" The death of the plaintiff within the three years would certainly have been a legal excuse from the further performance of his contract, since it was an employment of such confidence and skill as that of a clerk and agent for sale. On the other hand, this employment could continue no longer than the business in which the employer was engaged and the plaintiff retained. The intestate when living could by the contract have required the services of the plaintiff in no other business than that in which he had engaged him, and with no other person than himself. It would seem, then, necessarily to follow that when the death of the employer put a stop to this business and left no legal right over it in the administrators except to close it up with the least loss to the estate of their decedent, they were by the contract bound no longer to employ the plaintiff, any more than he to serve them.

" The act of God had taken away the master and principal—the law had revoked his (plaintiff's) agency and stopped the business to which alone his contract bound him—and if he would serve the administrators in winding up the estate, it must be under a new contract with them, and under renewed powers granted by them."

" Any other result than that this contract of service was upon the implied condition that the employer as well as the employed was to continue to live during the stipulated term of employment, would involve us in the strange conclusion that the administrators might go on with the business of their intestate, in which the plaintiff must continue with powers unrevoked by the death of his principal, or that he, with new powers from them, was bound by the contract to serve them as new masters and in a different service, and that they were bound to grant him such powers and employ him for the stipulated time in such service:" Bland's Administrator v. Umstead, 23 Pa. 316.

Syl.: " All contracts are interpreted with reference to their subject-matter; and therefore a contract to perform certain duties growing out of an existing relation, ceases to be binding when the relation ceases."

" Where adjoining landowners make an agreement relative to the duty of each in maintaining a partition fence, and one of them dies, his administrator is not bound by the contract for any future repairs."

On page 317 Mr. Justice LOWRIE says : " Neither of the parties binds his executor or administrator in the covenant; and if he had attempted it, we do not see very well how he could have succeeded. . . . Besides this, all contracts must be construed with reference to their subject-matter, and a contract defining an existing relation can have no operation when that relation ceases, for its foundation is gone."

In Dickinson v. Calahan's Administrators, 19 Pa. 227, the court held : That where a lumber manufacturer agreed to sell to a lumber merchant, lumber to be sawed at his mill during five years, the lumber to be paid for as delivered, and before the expiration of the five years both parties die, the contract between the original parties was merely a personal relation which was dissolved at the death of either party to the

contract.   See also Dexter v. Norton, 47 N. Y. 62, People v. Globe Mut. Ins. Co., 91 N. Y. 174, Taylor v. Caldwell, 113 E. C. L. 826 (3 B. & S. 826), Marvel v. Phillips, 162 Mass. 399, Beach on Contract, secs. 227–230, and Smith's Master and Servant, *218.

In Farrow v. Wilson, L. R. 4 C. P. Cases, 744, the court said: " Generally speaking, contracts bind the executor or administrator, though not named.   Where, however, personal considerations are of the foundation of the contract, as in cases of principal and agent and master and servant, the death of either party puts an end to the relation."

In Wood on Master and Servant, section 95, " the death of the servant does not deprive his executors from recovery pro rata for services rendered what they were reasonably worth ; and when the master dies and the servant continues his period of service and completes it, he may recover the entire sum agreed upon, although the contract is dissolved by the death of either party."

In Commonwealth v. King, 4 S. & R. 109, it was held that even though an indenture of apprenticeship in terms bound the apprentice to his master, his heirs and assigns, without naming his executors, the contract could not be assigned by his executors.   See also to the same effect Commonwealth v. Leeds, 1 Ashmead, 405, and Lacy v. Getman, 119 N. Y. 109.

It is urged, however, on behalf of the plaintiff, that this contract survives to the plaintiff by its express terms ; that the language, " successors and assigns," used in clause two in connection with the business manager of the band, Mr. Blakely, the word " successor " in the fourth paragraph, and the language of the seventeenth paragraph, render the contract assignable even if it be treated as an employment where the personal qualities of each were relied upon at the time it was made.

I am unable to adopt this view.

The agreement, although very skilfully drawn, evidently was not written by a lawyer, but by a layman who, in selecting the words " successors and assigns," endeavored to use phraseology which he thought would cover an assignment to a corporation.   Nowhere in it do we find the words " executors " or " administrators," or any language which indicates that the

contract was intended to be treated upon Blakely's death as an asset of his estate, to vest in his legal representatives or to be assignable by them.

In reaching this conclusion, I have considered the fact that before, and at the time, of the execution of the contract of June 27, 1892, both the defendant and Blakely contemplated and expected the formation of a corporation of the character described in clause seventeen, which was actually organized under the title the " Blakely syndicate " on the day when the agreement was executed. Blakely was the president of this corporation and Sousa one of its stockholders.

On June 8, 1892, Blakely wrote Sousa as follows:

" Dear Sousa : I enclose herewith a draft of the proposed contract between you and me, to be succeeded by a like contract by the company which I am organizing for the purpose of succeeding me in this business, but if for any reason the company referred to should fail of organization, then this individual contract is to remain in force as specified by its terms."

On May 12, 1894, it was agreed in writing by Blakely and the defendant, inter alia, that Sousa should surrender his certificates of stock and the company be abandoned.

It was evidently the intent of the parties, by the words referred to, to impart to the contract the quality of assignability, which it would not otherwise have, and at the same time to limit the right to assign to the assignee contemplated by them and particularly referred to, to wit: the corporation mentioned in clause seventeen, and to it alone.

With the abandonment of the contemplated scheme of transfer to the said corporation, the right in Blakely to assign lapsed, and the contract became precisely what it would have been if the words " successors and assigns " had not been used at all.

3. It is also claimed for the plaintiff that clause two vested in Mr. Blakely and his legal representatives an exclusive right of property in Sousa's name in connection with musical organizations, and that the defendant was thereby forever deprived of the use of it in connection with any musical enterprise which he might thereafter desire to carry on for his own benefit.

The language relied upon is the following: " And that the organization " (see clause two) " shall be known as Sousa's Band, or shall have some title chosen by said Blakely with the

name of Sousa as a part thereof. Said name shall thereafter be a part of the property of said band, and be owned and controlled by the business manager thereof, or his successors and assigns."

I have already expressed my understanding of the intent of both parties in the use of the words "successors" or "successors and assigns," and have found that they were meant to apply only to the corporation mentioned in clause seventeen of the contract.

I am also of opinion that the defendant could not have sold and assigned his name to be used after the term of Sousa's service, and independently of him, or of his work, in connection with a band with which he was not to be associated or interested in any respect, so as to confer upon Blakely and his legal representatives the exclusive right to it, claimed by plaintiff. Such an assignment could not be enforced, if for no other reason, than that it would be contrary to public policy and enable the assignee to impose upon and deceive the public, inducing attendance upon concerts by the false impression that they were to be given by Sousa, when in fact he would have nothing whatever to do with them.

The right of one person to use the name of another, in connection with a business or a manufactured article, doubtless passes under an assignment and sale of good-will, which includes the right to the trade name. It has been repeatedly held that a trade-mark or a trade name, representing an article of commerce or a local business, is property which may be disposed of. But the name of an artist, an author, a musician, or a lawyer has never been regarded as a trade name and, as such, salable; the value of the names of such persons being entirely dependent upon their personal reputation, skill and experience, and indissolubly connected or associated with the owner. There is no property in a trade name merely as such, and separate from that which it represents; and if what the name signifies to the public is not true, the person using it is not entitled to protection by the courts.

In the very recent case of Mary E. Messer v. The Fadettes, 168 Mass. 140, the leader of an orchestra attempted to sell "all her right, title and interest in and to a musical organization or orchestra, together with the name by which it was designated,

the ' Fadette Ladies' Orchestra.' " After the sale the orchestra was continued independently of the purchaser and assignee, who thereupon filed a bill in equity for an injunction to restrain the defendants from continuing to use the name. This was refused, and the Supreme Court of Massachusetts, in an opinion delivered by Justice KNOWLTON, say :

" So far as Ethel Atwood (the assignor) had any right or ownership in the trade name which designated the organization under her management, it was personal to herself, depending upon her personal reputation and skill, and it was not assignable. . . . The case is not like those in which there is a sale of fixed property and a local business to which the name belongs and whose principal features remain unchanged after the sale. If the use by the plaintiff of the name ' Fadette Ladies' Orchestra ' would have any influence beneficial to herself upon the public who wished to procure the services of such an organization, it would be only to mislead and defraud them by implying that she and such musicians as she employed were the same persons who had formerly gained a good reputation under this name. It is well settled that the courts will not enforce a claim of this kind, which contains a misrepresentation to the public."

In Hughes v. Statham, 4 Barnewall & Cresswell, 187, the agreement was between two attorneys, and provided for a transfer of business, together with use of name. It was held that the portion of the contract relating to the purchaser's use of the seller's name was void as against public policy. See to same effect, Dean v. Emerson, 102 Mass. 480, Hoxie v. Chaney, 143 Mass. 592, and In re Swezey, 62 Howard's Pr. 215.

Skinner v. Oakes, 10 Mo. App. 45. The court of appeals in this case say : " If an author were to assign to another the privilege of publishing books with his name upon their title page, or if a painter were to sell to another the privilege of placing the former's signature on pictures painted by the latter, it cannot for a moment be supposed that any court would protect such a supposed right, even as against the original assignor. This point is absolutely clear, both upon principle and authority."

Hegeman v. Hegeman, 8 Daly, N. Y. 1. " When, however, the whole pecuniary value of a name . . . . is derived solely

from the personal qualities of the one to whom the name belongs, such as his skill, special knowledge and experience, or from the fact that the article is produced under his personal supervision, which imparts to it a special value, then the right to the name is not transmissible : " Leather Cloth Co. v. American Leather Cloth Co., 11 H. L. Cas. 523; Kidd v. Johnson, 100 U. S. 617; Dixon Crucible Co. v. Guggenheim, 2 Brewster, 321.

4. A further question is presented as to the meaning and effect of clause twelve, it being contended for the plaintiff that Blakely and his legal representatives thereby became entitled to one half of the profits of all sales and negotiations of musical compositions owned or controlled by defendant at the date of the contract, or composed or acquired by him thereafter until its termination, and that this right continues without limitation of time as to all future receipts from the sales of said musical compositions.

For the defendant it was argued that Blakely's right to a share of these receipts terminated with the contract at his death; that under said clause the plaintiff is entitled to no share of profits on music composed or acquired by defendant before Blakely's death, but sold or negotiated thereafter. I find upon this point in favor of the plaintiff. The language used is as follows : " And in case of any musical compositions by said Sousa during or prior to said period, the profits of the sale or negotiation of any such musical compositions and all other music now controlled by the said Sousa, or composed by him, during or prior to this engagement, including his 'Sheridan's Ride,' 'Ben Hur,' etc. (already composed), shall be divided equally between the parties to this agreement; the publication of these, if published by him, to be at the expense of said Blakely, said expense to be deducted from the receipts of the sales of said music before any division of profits shall be made."

The right to share the profits of sales or negotiations of the music referred to is without limitation as to duration, and upon Blakely's death was a part of his estate and vested in his legal representative, the plaintiff; it attached to all musical compositions composed or controlled by the defendant at the date of the agreement, viz : June 27, 1892, and also to all musical compositions composed by him thereafter until the end of his

employment by Blakely, which I have found terminated upon Blakely's death; Blakely expressly assuming the risk of loss of cost of publication.

The twelfth clause of exhibit " A " was never modified, nor was the right to a share of receipts from sales of musical compositions, thereby expressly provided for, ever surrendered by Blakely, although that this was contemplated by him in May, 1896, appears from his letter of May 7, of that year.

From the agreement of September 10, 1896 (exhibit " F "), the subject of the division of royalties was expressly excluded, to be " discussed and settled purely upon its merits, but not before the return of Mr. Sousa from Europe."

5. I find that under clause thirteen the right of property in the musical compositions therein mentioned, generally described as the musical library of the band, is in the plaintiff.

6. It is also claimed by the plaintiff that she is entitled to an account from Sousa of all transactions of the band since Mr. Blakely's death to the present time, whether the contract (exhibit " A ") be found to have terminated or to be still in force, and whether it be a partnership agreement or an employment of defendant by Blakely ; that the defendant having taken and used the band organized and employed by Mr. Blakely, with its assets, and continued the business, must, either as a surviving and liquidating partner or as an employee, account for the profits.    It is conceded by defendant that for the period from December 26, 1896, to April 6, 1897, during which he carried out Mr. Blakely's arranged programme, using his, Blakely's, contracts, arrangements, band and music, he acted under the oral agreement of December, 1896, referred to in the " Finding of Facts."    He contends, however, that he was relieved from all obligations to the plaintiff under said oral contract, by her conduct in refusing to pay him on account of his compensation, before the close of the tour, any moneys in excess of his weekly proportion of salary, viz : $115 ; her discharge, without his consent, of Mr. Christianer as business manager, and appointment of Mr. Strine in Christianer's place, also without his, defendant's, consent.

Having found as a fact that the oral contract referred to did not include an agreement by plaintiff to pay defendant before the termination of the tour any money in excess of $115 per

week, and also that the conduct of Christianer as business manager justified his discharge by plaintiff, I necessarily also find that defendant's refusal to act further for Mrs. Blakely, and his concerts given after April 6, 1897, on his own behalf and for his own benefit, with the band hired by her, and under contracts and engagements actually made by Mr. Blakely, running to May 23, 1897, constituted a violation of his duty to her, assumed by him under said oral contract; that he is accountable to her for all the moneys received by him from the band's performances during said period, and that she is entitled to her one half of the net profits thereof, as stipulated in said oral agreement.

I further recommend that a decree be entered by the court in the form hereto attached.

*Errors assigned* were in dismissing exceptions to the report of the referee.

*James M. Beck* and *John G. Johnson*, with them *W. C. Low*, for appellant.—The contract of June 27, 1892, did not terminate with the death of David Blakely on November 7, 1896: White v. Com., 39 Pa. 167; Billings's App., 106 Pa. 558; Stumpf's App., 116 Pa. 33.

The Blakely estate has a continuing right to the name of Sousa in connection with the musical organization known as Sousa's Band.

*James Gay Gordon*, with him *William A. Redding* and *Vernon M. Davis*, for appellee.—The contract between Blakely and John Philip Sousa did not survive the death of Blakely and inure to the benefit of his administratrix, the complainant: Dickinson v. Calahan, 19 Pa. 227 ; Lacy v. Getman, 119 N. Y. 109; Wolfe v. Howes, 20 N. Y. 197 ; Spalding v. Rosa, 71 N. Y. 40; Devlin v. The Mayor, 63 N. Y. 14; Fahy v. North, 19 Barber, 341; Seymour v. Cagger, 13 Hun, 29; Boast v. Firth, L. R. 4 C. P. Cases, 1; Dolan v. Rodgers, 149 N. Y. 493; Taylor v. Caldwell, 32 L. J. Q. B. 164; Lorillard v. Clyde, 142 N. Y. 460; People v. Globe Mut. Life Ins. Co., 91 N. Y. 180 ; Walker v. Tucker, 70 Ill. 527; Com. v. King, 4 S. & R. 109; Quain's App., 22 Pa. 510; Williams's App., 47 Pa. 283; Carr v. Lowry,

27 Pa. 257; Hauck v. Stauffer, 31 Pa. 235; Stewart v. Loring, 5 Allen, 306; Harrison v. Conlan, 10 Allen, 85; Wells v. Calnan, 107 Mass. 514; Eliot Nat. Bank v. Beal, 141 Mass. 566; Butterfield v. Byron, 153 Mass. 517; Dickey v. Linscott, 20 Maine, 453; Yerrington v. Greene, 7 R. I. 589; Shultz v. Johnson, 5 B. Mon. (Ky.) 497; Poussard v. Spiers, L. R. 1. Q. B. Div. 410; Bacon v. Pomeroy, 104 Mass. 577; Burwell v. Mandeville, 2 How. 560; Smith v. Ayer, 101 U. S. 320; Kirkman v. Booth, 11 Beav. 273; Story on Partnership (7th ed.), sec. 319*a*.

The contract did not confer upon David Blakely and upon the representative of his estate since his death, any property in, and the sole right to use the name " Sousa's Band " in connection with musical organizations, to the exclusion of any right therein in John Philip Sousa; Hoxie v. Chaney, 143 Mass. 592; In re Swezey, 62 How. Pr. (N. Y.) 215; Skinner v. Oakes, 10 Mo. App., 45; Hegeman v. Hegeman, 8 Daly (N. Y.), 1; Leather Cloth Co. v. American Leather Cloth Co., 11 H. L. Cas. 534; McVeagh v. Valencia Cigar Factory, 32 Official Gazette, 1124; Kidd v. Johnson, 100 U. S. 620; Whitthaus v. Braun, 44 Md. 303; Dixon v. Guggenheim, 2 Brew. 321; Messer v. Fadettes, 168 Mass. 140.

OPINION BY MR. JUSTICE BROWN, October 8, 1900:

Neither the complainant nor the respondent is satisfied with the decree made in the court below. Each has appealed from it, the former complaining that it gives her too little, and the latter asserting that she gets too much. The appeal of the complainant, though taken later than that of the respondent, will be first considered, as it raises the most important questions to be disposed of.

The contract out of which this controversy arose was in writing, having been executed by the parties to it on June 27, 1892, and the obligations assumed by each were to extend through a period of five years from August 1, 1892. Before the expiration of this period, David Blakely, one of the contracting parties, died, and the first and most important question is as to the effect of his death upon the agreement. His personal representative insists that the contract was unaffected by his death; that, as his substitute in it, she has succeeded to all his rights

under it, and can compel full performance by Sousa, the survivor. The latter, however, contends that personal services to be rendered by the deceased, who possessed peculiar ability and qualifications, were the inducements that led him to enter into the contract, and that the relations established by it were dissolved by the death of him whose personal qualities had so induced him. The effect of the death of a party to a contract whose distinctly personal services, involving peculiar skill and experience, are at the foundation of it, in the absence of any provision that the survivor must accept performance by the personal representative of the deceased, is not in doubt. This is settled by reason, and authorities are not wanting in support of it. "All contracts must be construed with reference to their subject-matter, and a contract defining an existing relation can have no operation when that relation ceases, for its foundation is gone:" Bland's Administrator v. Umstead, 23 Pa. 316. "The general doctrine on this point was very thoroughly examined and discussed by my Brother Lowrie, J., in Dickinson v. Calahan's Administrators, 7 Harris, 227. The conclusion arrived at there seems to be, that, if the contract of a decedent be personal, and the performance of the deceased himself be the essence thereof, his executors will not be liable, excepting only so far as the contract was broken during his lifetime; and the instance is given of a contract to impart artistic or mechanical skill and information. Such a contract could not devolve on the representatives of the deceased, for, as it was there said, 'we cannot suppose that the deceased was contracting for any kind of skill in his administrators : '" White's Executors v. Commonwealth, 39 Pa. 175. "Where the agreement is for services which involve the peculiar skill of an expert, by whom alone the particular work in contemplation of the parties can be performed, or, more generally, where distinctly personal considerations are at the foundation of the contract, the relation of the parties is dissolved by the death of him whose personal qualities constituted the particular inducement to the contract:" Billings's Appeal, 106 Pa. 558. "A contract to render such services and perform such duties is subject to the implied condition that the party shall be alive and well enough in health to perform it. Death or a disability, which renders performance impossible, discharges the contract:"

Marvel v. Phillips, 162 Mass. 399. The duty of the survivor to a contract of a strictly personal nature to perform his covenants terminates with the death of the other party to it, for the reason that neither of the contracting parties contemplated attemped performance by a substitute. Where distinctly personal services, requiring peculiar skill, are to be rendered by each of the contracting parties as inducements to the contract, there is mutuality, and the death of either of the parties is the death of the contract. In such a case, the personal representative of the deceased cannot call upon the survivor to perform, and the latter cannot require the obligations to him to be assumed and discharged by another.

Turning to the contract before us, what was its nature and what effect did the death of Blakely have upon it? On its face it sets forth a combination of the business ability of Blakely with the musical talent of Sousa for mutual profit. In its very first lines, the purpose of the agreement appears to be the formation of a musical organization of high excellence, the manager of the same to be David Blakely, who had been " the manager of the late tours of the U. S. Marine Band," and the musical director, John Philip Sousa. Each of the parties to the contract understood the personal qualities of the other and manifestly regarded them as the inducements to it. Without the business qualities, ability and experience of Blakely, or the musical skill of Sousa, the organization, to be known under the contract as " Sousa's Band," would not have been formed. We find this where we ought to find it, within the contract itself. We there find that David Blakely, styling himself " the manager of the late tours of the U. S. Marine Band," was " desirous of perfecting a new organization, for the purpose of securing high excellence in a military band, and, with that view, to secure the services of John Philip Sousa as its musical director," who was willing " on the terms set forth in the contract," to accept the position. The ninth clause of the agreement provides : " The musical direction of the aforesaid organization shall be in the hands of the said John Philip Sousa, and the business management in the hands of said Blakely, as aforesaid, but both shall mutually receive counsel in their respective positions, and especially regarding the preparation of programmes." The fifteenth clause is as follows : " It is agreed that both par-

ties to this agreement shall do all that within them lies to make the enterprise herein contemplated a success, both musically and financially; and, in general, they shall both spare no pains to forward the interests of the business connected directly or indirectly therewith." Nowhere does it appear that either of the contracting parties contemplated the services of any one else. They, and they alone, by the combination of their own personal qualifications, were to strive for the success of the enterprise. Having understood that each relied upon the peculiar qualities of the other, neither bound his executors or administrators, for the death of either would make it impossible for the contract to survive, and, in such case, "non tenetur promissor." Blakely's business qualities and ability as the manager of the band would pass away with him, and Sousa's great skill would not be found in his executor or administrator. The compensation to be paid to Sousa included a proportion of the annual net profits of the enterprise. He was not to receive a fixed compensation at all times, but one which depended upon the success of the enterprise. He agreed to such compensation, feeling that the intelligent business direction of Blakely would make it sufficient; but, in no place in his agreement is there any provision on his part that he would trust his profits to the business management of another. This alone ought to be conclusive of his right to insist that no one can be substituted as manager for Blakely. It is true that an assignment of the contract was contemplated by the parties, but only under certain conditions. The words "executors or administrators" cannot be found in it, or any other words indicating an intention that, upon Blakely's death, his personal representative should take his place. The learned referee did find as a fact that, before and at the time of the execution of the contract, Blakely and Sousa contemplated the formation of a corporation to be known as "The Blakely Syndicate." It was to be perfected by Blakely and a clause provided that, if the corporation should not be formed, the contract should be and remain in full force as to both parties to it. This corporation, if formed, was to succeed, by assignment of the contract, to the rights under it, but no other was to be an assignee. If the contract was to be generally assignable, what necessity was there for this express provision that it might be assigned to the company to be formed

by Blakely? The answer must be that the assignability was clearly limited to the corporation to be so formed, and extended to no one else. " Expressio unius, exclusio alterius."

Going outside of the contract, the learned referee properly found that the personal qualities of each of the parties constituted a potential inducement to the making of it. In her bill of complaint, asking for relief, the peculiar skill, business ability and experience of Blakely, and the character of services which he performed under the contract, are all set forth, and he must have understood, when he lived, as his personal representative manifestly does now, that these qualities were the inducement leading Sousa into the compact. The referee was, therefore, clearly right in holding that the relations which had existed between Blakely and Sousa under the contract of June 27, 1892, and extended by the agreement of September 10, 1896, were terminated by the former's death on November 7, 1896, and the first four assignments of error are overruled.

We come now to a consideration of the right of Blakely's estate to use Sousa's name in connection with musical organizations. It is contended by the complainant that the said name became the property of Blakely, and, upon his death, passed to his estate. Apart from the absence of any words showing that any part of the contract was assignable, except under the limitation already referred to, the assignment of the name "Sousa" cannot be enforced, for the reason that its enforcement would be against public policy and enable the assignee to impose upon and deceive the public by inducing them to attend concerts under the impression that they were to be given by Sousa, when, in fact, he would have nothing whatever to do with them. It is true that the right of a person to use the name of another in connection with a business or a manufactured article passes under an assignment and sale of good-will of the business, which includes the right to the trade name. It has often been held that a trade-mark or a trade name, representing an article of commerce or a local business, is property which may be disposed of; but the name of an artist, an author, a musician or a lawyer has never been regarded as a trade name and, as such, salable. The value of the names of such persons depends entirely upon their personal reputation, skill and experience, and is indissolubly connected or associated with the owner. " There may, no

doubt, be cases where the personal skill of an artist or artisan may so far enter into the value of a product that a trade-mark bearing his name would, or, at least, might, imply that his personal work or supervision was employed in the manufacture; and, in such case, it would be a fraud upon the public if the trade-mark should be used by other persons, and, for this reason, such trade-mark would be held to be unassignable. It is, in any case, a question whether the use of the trade-mark would give to the public or to purchasers a false idea as to who made the article; and a court of equity would not lend any active aid to sustain claim to a trade-mark which would contain a misrepresentation to the public:" Hoxie v. Chaney, 143 Mass. 592.

In Messer v. The Fadettes, 168 Mass. 140, the leader of an orchestra attempted to sell all her right, title and interest in and to a musical organization or orchestra, together with the name by which it was designated, the "Fadette Ladies' Orchestra," and it was held that the name was unassignable, that the use of it by the assignee would mislead and defraud the public, and, for that reason, the claim to have the assignment enforced would not be sanctioned by the courts. In Skinner v. Oakes, 10 Mo. App. 45, it was held: "If an author were to assign to another the privilege of publishing books with his name on their title page, or if a painter were to sell to another the privilege of placing the former's signature upon pictures painted by the latter, it cannot, for a moment, be supposed that any court would protect such supposed right, even as against the original assignor. This point is absolutely clear, both upon principle and authority." In Hegeman v. Hegeman, 8 Daly (N. Y.), 1, it was held: "When, however, the whole pecuniary value of a name is derived solely from the personal qualities of the one to whom the name belongs, such as his skill, special knowledge and experience, or from the fact that the article is produced under his personal supervision, which imparts to it a special value, then the right to the name is not transmissible." It is useless to multiply authorities. The name "Sousa" in connection with the band implies his skill, science and art. Even as against him, the assignor of his name to another, the assignment cannot be enforced in a court of equity. To do so would be to lend ourselves to fraud and imposition upon the public, when it is our duty, in every instance, to pro-

tect them. The seventh and eighth assignments of error are also overruled.

The fifth assignment challenges the correctness of a finding of fact by the referee. We cannot and ought not to disturb the finding, and the assignment falls. We cannot sustain the sixth because the referee's conclusion, approved by the court below, that Mrs. Blakely was entitled to only one half of the net profits of the band's performances, running to May 23, 1897, inclusive, was based upon his finding that, after the death of Blakely, the appellant and the appellee had entered into an oral contract, by the terms of which the former " was to employ all members of the band and officers, pay all salaries, receive all receipts, pay expenses, and account for and pay to defendant (Sousa) compensation in accordance with the terms of the contract between him and Mr. Blakely as it existed at the time of Blakely's death." At that time, the profits were equally divided, in accordance with the modification of the contract made by Blakely himself, and, as the liability of the appellee to account for the performances held up to, and including, May 23, 1897, depends upon his oral agreement with Mrs. Blakely, the measure of it must be there found. It was one half of the profits, and the referee properly recommended a decree that the appellee so account.

If, as we have held, sustaining the referee and the court below, the contract between Blakely and Sousa terminated at the former's death, the latter's liability to do or perform anything ended at the same time. Whatever Sousa may have done after Blakely's death he did for himself. The term of his employment ended with the death of his employer, and, thereafter, the fruits of his genius and skill, no longer directed by another, were his own. The music which he composed when his time was again his own, belonged to him, and no error was committed in restricting his liability for royalties to the music which had been composed in the lifetime of his employer. The ninth assignment, therefore, and the tenth, which raises all the important questions just disposed of, are overruled, and the decree of the court below, made in accordance with the referee's exceptionally well-considered report, is affirmed, and the appeal dismissed at the costs of the appellant.

MITCHELL, J., dissents.